DAVID J. BROWN, ESQ. (SBN 56628)
(davidb@mbvlaw.com)
MBV LAW LLP
davidbrown@mbvlaw.com
855 Front Street
San Francisco, California 94111
Telephone:    415-781-4400
Facsimile:    415-989-5143

Attorneys for Plaintiff John A. Ryan

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In Re | CASE NO. 05-32933 Chapter 7 |
| JOHN A. RYAN and DANIELLE T. RYAN, | |
| Debtors, | |
| JOHN A. RYAN, an individual, | ADVERSARY NO. 09-03134 |
| Plaintiff, | |
| v. | **DECLARATION OF JOHN A. RYAN** |
| NICKLOS CIOLINO; CHARLES CIOLINO; ROBERT AGUILAR; STEPHEN DANIELE; DANIEL DELORENZI; ALMA CIOLINO; EVELYN CIOLINO; PRISCILLA AGUILAR; THERESA DANIELE; and DOES 1 to 25, inclusive, | DATE:    AUGUST 6, 2010<br>TIME:    11:00 AM<br>PLACE:    DEPARTMENT 22<br>JUDGE:    MONTALI |
| Defendants. | |

M B V   L A W   L L P
855 Front Street
SAN FRANCISCO   CA 94111

I, John A. Ryan declare:

1.     I am the plaintiff in this case and was the defendant in the underlying case which is the subject matter of this case. I have specific personal knowledge of all facts herein derived from my direct participation in and attendance at the trial of the underlying case and many of the pre-trial activities. Furthermore I interacted with representatives of the Securities and Exchange Commission ("SEC") and the Florida State prosecutors involved in investigating and pursuing persons involved in the Paramount fraud and various frauds perpetrated in part in Florida.

2.     Attached hereto as Exhibit 1 are true and correct copies of relevant excerpts, the pertinent cover and certification pages from the official transcript of the trial of the underlying action. The excerpts are in page number order and organized chronologically.

3.     Attached hereto as Exhibit 2 is a true and correct copy of a relevant excerpt, the cover page and certification page from the transcript of the hearing, held on June 16, 2006, on the plaintiffs in the underlying action's motion for summary judgment with respect to non-dischargeability of the judgments at issue in this case.

4.     At the appellate hearing in the underlying case which I attended, one of the appellate justices upbraided my attorney for his poor presentation and poor briefing, and also asserted that the nature and quality of the appellate work suggested that the purpose of the appeal was to buy more time before the judgment was enforced, rather than meaningfully assert an appeal. Nothing prevented the judgment from being enforced because I could not afford an appellate bond. In my view, the appellate court's attitude was incorrect but may have played a role in the rulings on the appeal.

5.     At the underlying trial the plaintiffs and their expert through their attorney and in some of their own testimony made references to the SEC's complaint against me as the basis for asserting that I had operated a Ponzi scheme. Those claims and that point were later refuted by the SEC when in 2004 it concluded in its findings that I did not know that Paramount was "in fact not a hedge fund and did not buy or sell securities for clients' accounts."

6.     I was not indicted nor prosecuted in any fashion by the Ohio Federal criminal prosecutor who pursued Cummings.

DECLARATION OF JOHN A. RYAN

M B V    L A W    L L P
855 Front STREET
SAN FRANCISCO    CA 94111

7.     On October 14, 2004, the Securities and Exchange Commission issued its findings in which it stated that: "Between January 1, 2001 and July 5, 2001, Ryan was associated with Paramount Financial, a purported hedge fund that was falsely represented to investors as generating large returns for clients. Unbeknownst to Ryan at the time, Paramount Financial was in fact not a hedge fund and did not buy or sell securities for clients' accounts." A true copy of the Securities and Exchange Commission's Order Instituting Administrative Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934 and Section 203(f) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions of April 26, 2004, and the letter transmitting it to me, is attached hereto as Exhibit 3.

8.     I participated in and attended my trial in San Mateo Superior Court that led to the judgment being challenged in this action. As I reflect upon what happened at that trial, and in my appeal in state court, I believe that if I could have countered the Ponzi scheme claims being made based on the SEC Complaint, called the SEC Report by several witnesses including the underlying plaintiffs' purported securities law expert, Mr. Karel, with the later issued Order Instituting Administrative Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934 and Section 203(f) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions of April 26, 2004, I believe I could have obtained a significantly better and more favorable result. The references at trial by witnesses that there was an SEC report that said I was running my own Ponzi scheme were difficult to overcome because of prejudicial nature of the reference to the SEC.

9.     I additionally believe that my cause would have been greatly helped if I could have shown that after a full investigation of Paramount and Cummings by Ohio Federal Prosecutors, Mr. Cummings' plea bargained and was convicted and sentenced to jail, while no prosecution of me occurred at all.

10.    I additionally believe that my cause would have been greatly helped if I could have shown that after a full investigation of the Morningstar matter by Florida state prosecutors, the result was the prosecution and by plea bargain and in one instance by jury trial, the convictions of the wrongdoers, while I was treated and labeled a victim and was praised for

2
DECLARATION OF JOHN A. RYAN

M B V    L A W    L L P
855 Front STREET
SAN FRANCISCO CA 94111

assisting in the prosecutions.  Ms. Lexa's declarations filed in support of my opposition to the pending summary judgment motion show these facts in detail.

11.     I waited to bring this action until the last of the investigations had reached its near final culmination because it seemed logical and practical, if not necessary to wait to attack the judgments until I could attack all aspects of all of them.  The last piece to fall into place was completion of the Florida investigation and near completion of its prosecution of the perpetrators of the fraud that related to that portion of the judgment against me pertaining to Defendant Daniele.  To act before my clear absolution by the Florida prosecutors and the focus of the case on each and all of the defendants in that prosecution would have left me with having to bring successive actions with respect to the judgments against me and the fact that there remained a judgment against me which said I had committed a fraud supportive of punitive damages.  A piecemeal attack on the judgments would not have been appropriate or fair to me.  No prejudice has occurred to the underlying plaintiffs that I can see.

12.     For a period of time when I was working for Paramount trying to find investors, Mr. Cummings wanted to open a bank account for Paramount in California.  He was having trouble getting a bank to open an account and directed me to take some of the investors' money and deposit into my personal account while he worked to straighten out the opening of a Paramount account.  What use was made of that money was under Mr. Cummings full direction and control, and to my knowledge all of such money was correctly handled by me following Mr. Cummings directions with respect to it.

13.     Mr. Cummings recruited me as an employee of Paramount to help find "investors" but did not make me aware in any fashion that Paramount was being operated to defraud investors as a Ponzi scheme or in any other way.

14.     Rather, Mr. Cummings presented Paramount to me as being a legitimate investment business.

15.     Paramount employed me to find west-coast investors in Paramount.  I was told by Mr. Cummings that I was a finder, not a stockbroker, and that I would be paid a finder's fee for my assistance in locating new investors for Paramount.

3

16. I never knew that the Paramount investments were not legitimate.

17. During the time at issue, I received no hints, clues or other information from Mr. Cummings or anyone else that Paramount was not in fact a straight forward business investment.

18. In connection with my employment I received from Mr. Cummings Prospectuses. These Prospectuses were not drafted not prepared by myself, or others at my instruction. Mr. Cummings instructed me to provide the Prospectuses to prospective investors with Paramount.

19. I did not create or maintain trade confirmations and monthly account statements for Paramount.

20. Prior to my trial, which occurred in December 2003, Mr. Cummings was deposed in the case, but was instructed by his criminal attorney not to testify to anything regarding Paramount. This refusal to testify was based on Mr. Cummings assertion of his 5th amendment right against self-incrimination.

21. I testified in the trial of the Florida prosecution of Jean Claude Noel ("Noel") that I introduced Stephen Daniele to Mark Deyak from Macat Corp. after receiving assurances from principals of Morning Star Group, AIBC Trade Services, Inc. and Wall Street Connections that together upon delivery of an advance fee to Morning Star Financial Group we would be able to procure or fund a letter of credit for the benefit of Paramount Financial Partners and Von Cummings. I testified at the Noel trial that of the $300,000 forwarded to Morning Star Financial Group, $100,000 of it came from Stephen Daniele as transferred from Mr. Daniele to Mr. Deyak's company Macat Corp. to Morning Star Group.

22. I was interviewed by the SEC on December 6, 2001.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true. This declaration was executed on July 9, 2010, at Cabo San Lucas, Mexico.

/s/ John A. Ryan
John A. Ryan

4

# EXHIBIT 1

```
 1          COURT OF APPEAL OF THE STATE OF CALIFORNIA

 2                  FIRST APPELLATE DISTRICT

 3                        DIVISION ONE

 4                         ---oOo---

 5    NICKLOS CIOLINO,          )
      CHARLES CIOLINO,          )
 6    STEPHEN DANIELE,          )
      DANIEL DELORENZI,         )
 7    ROBERTY AGUILAR,          )
              Plaintiffs,       )
 8        vs.                   ) Case No.  422430
      JOHN A. RYAN,             ) VOLUME 2
 9          Defendant.          ) PAGES 32 TO 259
                                )
10    JOHN A. RYAN,             )
         Cross-Complainant,     )
11        vs.                   )
      VON C. CUMMINGS, et al.,  )
12      Cross-Defendants.       )
                                )
13    AND ALL OTHER RELATED     )
      CROSS ACTIONS             )
14    _____  )

15                 REPORTER'S TRANSCRIPT ON APPEAL
                   APPEAL FROM THE SUPERIOR COURT
16                     OF SAN MATEO COUNTY

17    DECEMBER 2, 4, 5, 8, 9, 10, 11, 12, 15, 2003
        DECEMBER 16, 17, 18, 19, 22, 23, 26, 2003
18            DECEMBER 29, 30, 31, 2003
                 JANUARY 8, 9, 2004
19
      A P P E A R A N C E S:
20
      FOR THE PLAINTIFF    WILLIAM LOCKYER
21    AND RESPONDENT:      ATORNEY GENERAL OF THE
                           STATE OF CALIFORNIA
22                         50 FREMONT STREET
                           SUITE 300
23                         SAN FRANCISCO, CA 94102

24    FOR THE DEFENDANT
      AND APPELLANT:       JOHN RYAN
25
      REPORTED BY:     DEBRA RAMIREZ, CSR NO. 7692
26                     OFFICIAL COURT REPORTER
```

```
 1                IN THE SUPERIOR COURT
              OF THE STATE OF CALIFORNIA
 2         IN AND FOR THE COUNTY OF SAN MATEO
                     ---oOo---
 3
      NICKLOS CIOLINO,           )
 4    CHARLES CIOLINO,           )
      STEPHEN DANIELE,           )
 5    DANIEL DELORENZI,          )
      ROBERTY AGUILAR,           )
 6            Plaintiffs,        )
                                 )
 7      vs.                      ) Case No. 422430
                                 ) VOLUME 2
 8    JOHN A. RYAN,              ) PAGES 32 TO 259
              Defendant.         )
 9    _____)
      JOHN A. RYAN,              )
10      Cross-Complainant,       )
        vs.                      )
11    VON C. CUMMINGS, et al.,)
        Cross-Defendants.        )
12    _____)
      AND ALL OTHER RELATED      )
13    CROSS ACTIONS              )
      _____)
14
          TRANSCRIPT OF JURY TRIAL PROCEEDINGS
15
       BEFORE:  HON. THOMAS MCGINN SMITH, JUDGE
16
                   DEPARTMENT 41
17
      DECEMBER 2, 4, 5, 8, 9, 10, 11, 12, 15, 2003
18       DECEMBER 16, 17, 18, 19, 22, 23, 26, 2003
             DECEMBER 29, 30, 31, 2003
19                JANUARY 8, 9, 2004

20    A P P E A R A N C E S:
      FOR PLAINTIFFS:  MICHAEL D. LIBERTY
21                     ATTORNEY AT LAW
                       1290 HOWARD AVENUE, #303
22                     BURLINGAME, CA 94010

23    FOR DEFENDANT:   LOUIS S. FRANECKE
                       ATTORNEY AT LAW
24                     4380 REDWOOD HIGHWAY, #A6
                       SAN RAFAEL, CA 94903
25                  REPORTED BY
           DEBRA L. RAMIREZ, CSR. NO. 7692
26             OFFICIAL COURT REPORTER
                     ---oOo---
```

1    putting it into his personal bank account,

2    paying off his friends, paying off his

3    relatives.

4         Now, there is such a thing in the

5    law --

6         Your Honor, may I approach the

7    board, please?

8         THE COURT:  Yes.

9         MR. LIBERTY:  There is such a thing

10   called a ponzi scheme, and that's what this

11   is.  A ponzi scheme is best diagrammed by

12   this triangle on this blackboard.

13        What that means, ladies and

14   gentlemen, is the bad guys get money from

15   new investors, and they move up the chain.

16        New investors come in.  They move to

17   level two.  New investors come in behind

18   them, they go to level one.  The bad guys at

19   the top like Mr. Ryan take the money and

20   they pay off the guys who get up to the top.

21        The problem is the people that

22   Mr. Ryan was paying off were his co-workers,

23   his friends, and his relatives.  By the time

24   my guys get in, five of them, the money was

25   running out because they weren't coming up

26   with enough new blood, enough new suckers

1    that Mr. Ryan suckered into this deal, and

2    that's why they're sitting here.

3          Now when I asked Mr. Ryan at

4    deposition:

5          "What happened?"

6          "Well, I was defrauded,

7          Mr. Liberty."

8          "Oh, you were defrauded.  Well,

9           let's think.  How are you

10          defrauded?"

11          "Well, I was defrauded by a guy name

12           Von Cummings."

13          Von Cummings is a man out of Ohio

14    that Mr. Ryan is going to try to pin the

15    blame on.  He was the head of the east

16    operation.  Mr. Ryan was the head of the

17    west operation.

18          "Okay.  Well, how did Von Cummings

19           defraud you?"

20          "Well, Von Cummings told me all this

21           bad information that turned out to

22           be not true."

23          "Okay.  Well, did you create any

24           documents and talk to my clients?"

25          "Well, yeah," says Mr. Ryan, "I did

26           but only what Von Cummings, the bad

```
 1              The ponzi scheme started to unravel,
 2      but John Ryan started to chase the money
 3      back.
 4              The evidence will show the reason
 5      why he was trying to chase that money,
 6      because he knew he was responsible for these
 7      losses.
 8              So what was he trying to do?  I give
 9      him a little credit for this.  He was trying
10      to go get the money back.  He couldn't do
11      it, because it was gone.  Evidence of the
12      scheme, evidence of his culpability.  In
13      order to induce Nick Ciolino to invest, John
14      Ryan held up a check for $44,000.  Look what
15      a good idea, 44,000 on this guy's
16      investment.  The check was to John Ryan's
17      brother-in-law.  He duped Nick into
18      investing.  Then when Nick invested, he got
19      him a check for $28,000 to dupe these guys
20      into investing.
21              What you'll hear Nick Ciolino
22      testify about is that the way that John got
23      him to invest was to go to him and to
24      embarrass him.
25              John would come up to Nick and say,
26              "Nick, you're a plumber.  You want to
```

1    discovery, I had to ask what's that word

2    again -- jade? You know, the little pieces

3    of green stone.

4        Mr. Ryan told my clients that their

5    investments were backed. The numbers

6    changed radically. Some between $650

7    million and 150 million. You are okay

8    because the Paramount has a jade collection

9    that is backing your money.

10       Totally bogus. Totally fraudulent,

11    the misrepresentations, and I'm just about

12    to be closing up, ladies and gentlemen, but

13    I have to tell you the legal arguments.

14       The misrepresentations were that the

15    investment vehicle was safe and secure, told

16    that to these gentlemen that if these

17    gentlemen, my clients, invested, they would

18    get either a 40 percent return, or at a

19    minimum, their money back plus 10 percent.

20    That Bear, Stearns, the great investment

21    company insured their money. Totally

22    fraudulent. That if they invest, they would

23    get a greater than a 28 percent return, and

24    their money would all be returned by June of

25    2001. Totally fraudulent.

26       Mr. Ryan never advised them of the

```
1    risks.  Never told them about the security
2    or lack of security, and certainly never
3    disclosed that the grand ponzi scheme that
4    he was embarking on.
5          As a matter of fact, Mr. Ryan formed
6    a company called Bianki Investment Group,
7    and he would have certain documents on that
8    letterhead.
9          Bogus company.  It was a shell
10   corporation.  It did nothing but to give him
11   an error of credibility.  He had these
12   letterheads printed up, and sometimes he
13   would fax my clients letters.  The address
14   on that, by the way, was a mailbox USA down
15   in Redwood City.
16         Did John Ryan have an office?
17         No.  He had a business card.  He
18   called himself the West Coast Regional
19   Manager, or something like that, and he had
20   an address of 1101 El Camino Real in San
21   Mateo.  Was that John Ryan's office?  No.
22   Total fraud.  It wasn't his office.  It was
23   a friend of his office, but you look at the
24   business cards, and they look pretty good.
25         John Ryan.  Paramount was the name
26   of the company that he was working for.
```

```
 1              I will have an expert testify,

 2       ladies and gentlemen, that John Ryan was

 3       selling securities without a license.  You

 4       can't do that.  He told Nick Ciolino:  "I

 5       have a license."

 6              When I took his deposition, "Do you

 7              have a license to sell securities,

 8              Mr. Ryan?"

 9              "No."

10              "Then why did you tell Nick Ciolino

11               that?"

12              It's truly going to be a he said, he

13       said, and you're going to have to weigh the

14       credibility of these gentlemen against John

15       Ryan.

16              They all entered into oral

17       agreements with Mr. Ryan for the investment

18       and for the return of their moneys, and he

19       broke that oral agreement.  They have

20       sustained incredible damages.  He has

21       engaged in unfair business practices.  Our

22       society just doesn't allow people to do

23       that.  We don't allow people like John Ryan

24       to do this to these men and get away with

25       it, and this is where justice is going to

26       happen.
```

1        MR. FRANECKE:  Objection, Your

2    Honor.  This is not an opening statement.

3    It's argument.

4        THE COURT:  The objection is

5    overruled.

6        You may continue.

7        MR. LIBERTY:  Thank you, Your Honor.

8        One additional claim I have to tell

9    you about is for Charles Ciolino.  Under the

10   law there is a cause of action for elder

11   abuse.  We seek in our society to protect

12   elders.  He has an additional cause of

13   action for elder abuse, and that is where a

14   person like Mr. Ryan financially abuses

15   somebody and takes their money, and I will

16   tell you that, and I will show you that

17   Mr. Charles Ciolino, because of his age is a

18   victim of elder abuse, and I will ask you

19   when you go into the jury room, to check the

20   box that says that Mr. Ryan did abuse this

21   nice lovely man who happens to be an elder.

22       Let me just refer to some documents,

23   and I'll close up as quickly as I can.

24       Ryan admits he put money into his

25   bank accounts.  He created a chart.  Some of

26   my investors' money went into his bank

```
 1          COURT OF APPEAL OF THE STATE OF CALIFORNIA

 2                   FIRST APPELLATE DISTRICT

 3                        DIVISION ONE

 4                        ---oOo---

 5   NICKLOS CIOLINO,           )
     CHARLES CIOLINO,           )
 6   STEPHEN DANIELE,           )
     DANIEL DELORENZI,          )
 7   ROBERTY AGUILAR,           )
               Plaintiff,       )
 8      vs.                     ) Case No. 422430
     JOHN A. RYAN,              ) VOLUME 5
 9          Defendant.          ) PAGES 500 TO 649
                                )
10   JOHN A. RYAN,              )
        Cross-Complainant,      )
11      vs.                     )
     VON C. CUMMINGS, et al.,   )
12     Cross-Defendants.        )
                                )
13   AND ALL OTHER RELATED      )
     CROSS ACTIONS              )
14                              )

15              REPORTER'S TRANSCRIPT ON APPEAL
                APPEAL FROM THE SUPERIOR COURT
16                   OF SAN MATEO COUNTY

17   DECEMBER 2, 4, 5, 8, 9, 10, 11, 12, 15, 2003
     DECEMBER 16, 17, 18, 19, 22, 23, 26, 2003
18          DECEMBER 29, 30, 31, 2003
               JANUARY 8, 9, 2004
19
     A P P E A R A N C E S:
20
     FOR THE PLAINTIFF    WILLIAM LOCKYER
21   AND RESPONDENT:      ATORNEY GENERAL OF THE
                          STATE OF CALIFORNIA
22                        50 FREMONT STREET
                          SUITE 300
23                        SAN FRANCISCO, CA 94102

24   FOR THE DEFENDANT
     AND APPELLANT:       JOHN RYAN
25
     REPORTED BY:     DEBRA RAMIREZ, CSR NO. 7692
26                     OFFICIAL COURT REPORTER
```

1    IN THE SUPERIOR COURT
    OF THE STATE OF CALIFORNIA
2  IN AND FOR THE COUNTY OF SAN MATEO
     ---oOo---

3

NICKLOS CIOLINO,    )
4 CHARLES CIOLINO,   )
 STEPHEN DANIELE,   )
5 DANIEL DELORENZI,  )
 ROBERTY AGUILAR,   )
6    Plaintiffs,  )
          )
7  vs.       ) Case No. 422430
         ) VOLUME 5
8 JOHN A. RYAN,    ) PAGES 500 TO 649
    Defendant.  )
9 _____)
 JOHN A. RYAN,    )
10  Cross-Complainant, )
  vs.       )
11 VON C. CUMMINGS, et al.,)
  Cross-Defendants.  )
12 _____)
 AND ALL OTHER RELATED )
13 CROSS ACTIONS    )
 _____)

14

   TRANSCRIPT OF JURY TRIAL PROCEEDINGS
15
  BEFORE: HON. THOMAS MCGINN SMITH, JUDGE
16
      DEPARTMENT 41
17
 DECEMBER 2, 4, 5, 8, 9, 10, 11, 12, 15, 2003
18  DECEMBER 16, 17, 18, 19, 22, 23, 26, 2003
    DECEMBER 29, 30, 31, 2003
19    JANUARY 8, 9, 2004

20 A P P E A R A N C E S:
 FOR PLAINTIFFS: MICHAEL D. LIBERTY
21      ATTORNEY AT LAW
       1290 HOWARD AVENUE, #303
22      BURLINGAME, CA 94010

23 FOR DEFENDANT: LOUIS S. FRANECKE
      ATTORNEY AT LAW
24      4380 REDWOOD HIGHWAY, #A6
       SAN RAFAEL, CA 94903
25      REPORTED BY
   DEBRA L. RAMIREZ, CSR. NO. 7692
26    OFFICIAL COURT REPORTER
      ---oOo---

Case: 09-03134 Doc# 36 Filed: 07/09/10 Entered: 07/09/10 16:49:22 Page 17 of 64

```
1       period, your only conduit of information as

2       you testified to was your son, Nick Ciolino,

3       was that right?

4           A.    That's right.  The information he

5       gave me was through John Ryan.

6           Q.    Excuse me, sir.  Were you ever

7       present at any conversation with John

8       Ryan -- John and Nick?

9           A.    No, I wasn't.

10          Q.    The court reporter can't take down

11      two people.  Let me finish my question.

12                Were you ever present when John and

13      Nick ever discussed anything having to do

14      with Paramount?

15          A.    No, I wasn't.

16          Q.    Is it true, sir, that the only thing

17      you know is what your son has told you with

18      regard to Paramount?

19          A.    The only thing I know about

20      Paramount is what Nick relayed from John to

21      me.

22          Q.    Sir, how do you know John relayed

23      it?

24          A.    How do I know?

25          Q.    Yeah.

26          A.    I think I downloaded the SEC report
```

1    that showed his Ponzi scheme.  I think

2    that's how I know to be true.

3    Q.   Sir, I move to strike the last

4    answer as unresponsive.

5    THE COURT:  The jurors will

6    disregard the last statement of his

7    testimony.

8    MR. FRANECKE:  I'm asking you what

9    you know.  You personally -- did you ever

10    know who Nick talked to?

11    A.   Yes.  He talked to John.

12    Q.   That's what you think, you weren't

13    present, you never saw it?

14    A.   No, I didn't.

15    Q.   Do you see any talk to Von Cummings?

16    A.   Not that I know of.

17    Q.   Do you know if Nick ever talked to

18    Von Cummings?

19    A.   No, I don't.

20    Q.   You don't know who else he might

21    have talked to; is that right?

22    A.   That's right.

23    Q.   Do you know what documents Nick

24    reviewed before he invested?

25    A.   No, I don't.

26    Q.   Do you know what documents Nick had

1   Q.    You also stated in your declaration,

2   second page under penalty of perjury,

3   Paragraph 3.

4           "All of the misrepresentations and

5               concealments of material facts were

6               made by John Ryan to Nick Ciolino

7               with the intention that the

8               misrepresentations would be

9               communicated to me, which they

10              were.  All of the

11              misrepresentations made by John

12              Ryan to my son were made to me."

13          Right?

14  A.    That's correct.

15  Q.    Okay.  You have known John Ryan for

16  30 years, right?

17  A.    Yes, I have.

18  Q.    Do you really think at the time

19  anything was talked about while you did your

20  investment that John Ryan would

21  intentionally misrepresent anything to Nick

22  or anybody else he talked to because he

23  didn't talk to you, anybody else he talked

24  to about this investment?

25  A.    I wouldn't believe anything until I

26  read a report of his Ponzi scheme.

1     Q.    Sir, I'm asking what you believe.

2     A.    This is what made my decision.

3           MR. FRANECKE:  Your Honor, I move to

4     strike.

5           THE COURT:  Well, not responsive.

6           Your motion is denied.  Ask your

7     question.

8           MR. FRANECKE:  Q.  The question is,

9     knowing him for 30 years, do you think he

10    had a character to misrepresent anything to

11    anybody if he knew it was wrong?

12    A.    I wouldn't have thought so, until I

13    read the report.  Then people change.

14    Q.    People change?

15    A.    People change.

16    Q.    You read a report?

17    A.    Yes.

18    Q.    That you believe tells you something

19    else?

20    A.    Yes, I do.

21    Q.    Right.  Do you ever call John and

22    ask him?

23    A.    Like I mentioned, I did call twice,

24    received no answer.

25    Q.    In fact, you sued him; is that

26    right?

1  A.    That's right.

2  Q.    You read a report that said Von

3  Cummings has defrauded hundreds of people

4  around the country and stolen millions of

5  dollars; is that right?  Right?

6  A.    I read a report from the SEC is that

7  stated Von Cummings had a Ponzi scheme and

8  John Ryan had his own Ponzi scheme.

9  Q.    John Ryan had his own Ponzi scheme?

10  A.    Yes, that's what it said.

11  Q.    Okay.  That's what we're going to

12  deal with here in this whole litigation.

13  How -- let's talk about the Ponzi scheme.

14  Now, you know what a Ponzi scheme is, right?

15  A.    Yes.

16  Q.    Okay.  Let's talk about that for a

17  second.  Is there any indication in anything

18  you have seen with regard to what was told

19  to you by your son, Nick, that John Ryan

20  knew at the time it was a Ponzi scheme?

21  A.    No.  No.  But he had his own Ponzi

22  scheme which means that if this deal would

23  have come back to me like it was supposed to

24  be insured.  Then this would be fine, but

25  not a penny came back to me.  So I am

26  assuming I should not -- same, I'm assuming

```
 1      I read this, and I believe that that's where
 2      the money is.
 3          Q.    Would you believe the mayor of
 4      Burlingame, CPA, about whether or not John
 5      ever actually made any money on this whole
 6      thing?
 7          A.    Would I believe that?
 8          Q.    Yeah.
 9          A.    I don't know.  I have to hear his
10      testimony.
11          Q.    Of course.  Would you -- actually,
12      would you also believe that Von Cummings
13      stole money?
14          A.    I don't know Von Cummings.  I don't
15      know what he did.
16          Q.    Right.  If you don't know Von
17      Cummings, what is it that you now -- why do
18      you believe then that John did something
19      wrong, you don't believe about Von Cummings,
20      but you believe John did?
21          A.    Why would the SEC put a report out
22      that's common knowledge that you can load
23      down from your computer stating that he had
24      his own Ponzi scheme, why would they say?
25          Q.    Why would they say that?
26          A.    Yes.
```

1    Q.    You want it to try the SEC case

2    here?

3    A.    I'm not trying the SEC case.  I'm

4    just saying this is what I read to get my

5    information, and you're saying it has no

6    bearing on it.

7         THE COURT:  Ladies and gentlemen,

8    we're not going to be paying attention to

9    these insinuations.  I'm going to at the

10   time tell you.  Right now don't get on your

11   computer and look for the searching report.

12        MR. FRANECKE:  I have to follow up

13   on one thing because of what bothers me.

14   There has been no -- well, no determination,

15   all right, with regard to John Ryan.

16        Back to the same question, would you

17   believe the mayor of Burlingame who did a

18   CPA evaluation to determine whether or not

19   John ever did anything wrong here?

20   A.    I would have to -- I would have to

21   hear his testimony before I could give you

22   an answer.

23   Q.    A couple of things in your

24   deposition.  You did know where you were

25   sending the money; is that right?

26   A.    Correct, I had wiring instructions,

1       COURT OF APPEAL OF THE STATE OF CALIFORNIA

2             FIRST APPELLATE DISTRICT

3                DIVISION ONE

4               ---oOo---

5   NICKLOS CIOLINO,     )
     CHARLES CIOLINO,    )
6   STEPHEN DANIELE,    )
     DANIEL DELORENZI,   )
7   ROBERTY AGUILAR,    )
          Plaintiffs, )
8    vs.            ) Case No. 422430
     JOHN A. RYAN,      ) VOLUME 9
9        Defendant.  ) PAGES 1138 TO 1256
                 )
10  JOHN A. RYAN,      )
      Cross-Complainant,  )
11    vs.            )
     VON C. CUMMINGS, et al.,)
12   Cross-Defendants.   )
     _____)
13  AND ALL OTHER RELATED  )
     CROSS ACTIONS        )
14  _____)

15          REPORTER'S TRANSCRIPT ON APPEAL
            APPEAL FROM THE SUPERIOR COURT
16          OF SAN MATEO COUNTY

17  DECEMBER 2, 4, 5, 8, 9, 10, 11, 12, 15, 2003
     DECEMBER 16, 17, 18, 19, 22, 23, 26, 2003
18       DECEMBER 29, 30, 31, 2003
          JANUARY 8, 9, 2004
19

A P P E A R A N C E S:
20

FOR THE PLAINTIFF   WILLIAM LOCKYER
21  AND RESPONDENT:     ATORNEY GENERAL OF THE
                 STATE OF CALIFORNIA
22                50 FREMONT STREET
                 SUITE 300
23                SAN FRANCISCO, CA 94102

24  FOR THE DEFENDANT
     AND APPELLANT:      JOHN RYAN
25

     REPORTED BY:       DEBRA RAMIREZ, CSR NO. 7692
26                OFFICIAL COURT REPORTER

```
 1              IN THE SUPERIOR COURT
            OF THE STATE OF CALIFORNIA
 2        IN AND FOR THE COUNTY OF SAN MATEO
                   ---oOo---
 3
      NICKLOS CIOLINO,          )
 4    CHARLES CIOLINO,          )
      STEPHEN DANIELE,          )
 5    DANIEL DELORENZI,         )
      ROBERTY AGUILAR,          )
 6            Plaintiffs,       )
                               )
 7      vs.                     ) Case No. 422430
                               ) VOLUME 9
 8    JOHN A. RYAN,             ) PAGES 1138 TO 1256
              Defendant.        )
 9    _____ )
      JOHN A. RYAN,             )
10        Cross-Complainant,    )
          vs.                   )
11    VON C. CUMMINGS, et al.,  )
          Cross-Defendants.     )
12    _____ )
      AND ALL OTHER RELATED     )
13    CROSS ACTIONS             )
      _____ )
14
          TRANSCRIPT OF JURY TRIAL PROCEEDINGS
15
        BEFORE:  HON. THOMAS MCGINN SMITH, JUDGE
16
                    DEPARTMENT 41
17
      DECEMBER 2, 4, 5, 8, 9, 10, 11, 12, 15, 2003
18      DECEMBER 16, 17, 18, 19, 22, 23, 26, 2003
              DECEMBER 29, 30, 31, 2003
19              JANUARY 8, 9, 2004

20    A P P E A R A N C E S:
      FOR PLAINTIFFS:  MICHAEL D. LIBERTY
21                     ATTORNEY AT LAW
                       1290 HOWARD AVENUE, #303
22                     BURLINGAME, CA 94010

23    FOR DEFENDANT:   LOUIS S. FRANECKE
                       ATTORNEY AT LAW
24                     4380 REDWOOD HIGHWAY, #A6
                       SAN RAFAEL, CA 94903
25                     REPORTED BY
            DEBRA L. RAMIREZ, CSR. NO. 7692
26            OFFICIAL COURT REPORTER
                   ---oOo---
```

```
 1      I saw either confirmation, or two, but I
 2      certainly was relying or I have relied in
 3      terms of understanding the Informax
 4      transaction through discussions, with your
 5      clients, and/or the SEC Complaint.
 6          Q.    What did you understand the Informax
 7      transaction to be?
 8          A.    Another strange thing.  The Informax
 9      transaction was to be -- they would be
10      investing in -- if that's the right word,
11      they would be putting their money into a
12      security that they were able to buy, I
13      guess, from what's indicated at below market
14      current market trading prices of a stock
15      that had gone public being Informax.  So
16      Informax is a publically or was a publically
17      traded security that during the time of
18      these situations here, that they went public
19      and began trading on the -- it would be a
20      NASDAQ stock over the counter.
21          Q.    You've had an opportunity to review
22      the SEC Complaint?
23              MR. FRANECKE:  Objection, Your
24      Honor.
25              THE COURT:  The objection is
26      overruled.
```

1     THE WITNESS: That's correct.

2     THE COURT: However, we are not

3  going to get into the SEC Complaint.

4     MR. LIBERTY: Shall I withhold

5  marking?

6     THE COURT: Whether you do or not, I

7  want to forewarn you.

8     MR. LIBERTY: Okay.

9  Q.   Now, you had an opportunity to

10 review John Ryan's deposition that he gave

11 before the Securities and Exchange

12 Commission?

13 A.   That's correct.

14 Q.   Did that assist you in formulating

15 opinions on whether Mr. Ryan was selling

16 securities?

17 A.   Yes.

18 Q.   Okay. Can you tell us what that

19 opinion is, please?

20 A.   That he was selling securities and

21 charging commission for those sales.

22 Q.   Now, what's the basis for that

23 statement?

24 A.   I don't recall the exact page, but

25 he was selling -- he was -- his commission

26 was two and a half dollars a share for every

1    Q.    Have you formed any opinions in

2    connection with reviewing documents and

3    speaking to my clients about what other

4    practices Mr. Ryan engaged in that you find

5    were improper?

6    A.    Well, in addition to the selling

7    securities without a license to sales

8    practices which, which either -- and I'm not

9    trying to render a legal opinion, but at

10   least according to, you know, what I

11   understand from a SEC point of view, or from

12   an Investment Advisor Act.

13         MR. FRANECKE:  Objection, Your

14   Honor.  Talking about the law.

15         THE COURT:  Overruled.  It goes to

16   the weight.

17         THE WITNESS:  You know, he was

18   positioning himself in such a way, both, as

19   a broker, and as an advisor, and thirdly,

20   from conversations and from the review of

21   the SEC documentation, and it's my opinion

22   there was a Ponzi scheme being transpired.

23   You know, for me it's unheard of with a --

24   what I would term a legitimate securities

25   sales practices whereby a client's fund go

26   into the seller's personal bank account by

1   way of example.

2           In my business, both as a -- when I

3   was a stockbroker, and as an investment

4   advisor, I've had clients come to me, and

5   this is both, whether I was at Payne, Weber

6   and as Karel Capital, Inc., and issued

7   checks to me personally, and I take that

8   check, and I say no, you cannot give that to

9   me.   It has to go to that, which is the

10  investment or the proper custodian that will

11  be maintaining your investment, and those

12  checks are dutifully either shredded or

13  voided and returned to the client.

14      Q.    You mentioned a Ponzi scheme.   What

15  is your definition of a Ponzi scheme?

16      A.    A Ponzi scheme is a true definition

17  with by parties take in certain amounts of

18  money that are promising certain types of

19  gains, and that money based upon an

20  investment that that investment never really

21  happens.   Funds are taken and the investment

22  does not happen, and the perpetrators of the

23  Ponzi scheme induce other investors to come

24  in by paying them out some of the proceeds

25  of the first people who put in the money.

26  It's a pyramid scheme.

1    Q.    Is that what you understood happened

2    to some of my clients' moneys?

3    A.    Yes.

4    Q.    You understand that there were some

5    investors that were paid off in January of

6    2001?

7    A.    Yes.

8    Q.    What was the impropriety, if you

9    will, of Mr. Ryan's sales practices?

10   A.    Two principal loans.  One would be

11   the guaranteeing of their funds, and two,

12   and this is part and parcel of the

13   guaranteeing of not only their funds, but

14   what I thought was an unusual rate of return

15   on the investments; and thirdly, and I would

16   keep coming back to this, the use of a

17   brokerage firms new account documentation to

18   qualify the client for the investment.

19   Q.    That's the Bear, Stearns

20   application?

21   A.    That's correct.

22   Q.    What's wrong with using that by --

23   what is wrong with Mr. Ryan using that?

24   A.    Well, No. 1, it's not his, nor is he

25   a representative of Bear, Stearns.  The only

26   people who should be using a Bear, Stearns

1        COURT OF APPEAL OF THE STATE OF CALIFORNIA

2               FIRST APPELLATE DISTRICT

3                  DIVISION ONE

4                  ---oOo---

5   NICKLOS CIOLINO,        )
     CHARLES CIOLINO,       )
6   STEPHEN DANIELE,       )
     DANIEL DELORENZI,      )
7   ROBERTY AGUILAR,       )
           Plaintiffs,   )
8     vs.               ) Case No. 422430
     JOHN A. RYAN,         ) VOLUME 10
9         Defendant.    ) PAGES 1257 TO 1543
     _____)
10  JOHN A. RYAN,         )
       Cross-Complainant,   )
11    vs.               )
     VON C. CUMMINGS, et al.,)
12   Cross-Defendants.   )
     _____)
13  AND ALL OTHER RELATED   )
     CROSS ACTIONS         )
14  _____)

15            REPORTER'S TRANSCRIPT ON APPEAL
             APPEAL FROM THE SUPERIOR COURT
16              OF SAN MATEO COUNTY

17  DECEMBER 2, 4, 5, 8, 9, 10, 11, 12, 15, 2003
      DECEMBER 16, 17, 18, 19, 22, 23, 26, 2003
18        DECEMBER 29, 30, 31, 2003
             JANUARY 8, 9, 2004
19

20  A P P E A R A N C E S:

     FOR THE PLAINTIFF   WILLIAM LOCKYER
21  AND RESPONDENT:     ATORNEY GENERAL OF THE
                    STATE OF CALIFORNIA
22                 50 FREMONT STREET
                    SUITE 300
23                 SAN FRANCISCO, CA 94102

24  FOR THE DEFENDANT
     AND APPELLANT:      JOHN RYAN
25

     REPORTED BY:       DEBRA RAMIREZ, CSR NO. 7692
26                 OFFICIAL COURT REPORTER

```
 1              IN THE SUPERIOR COURT
            OF THE STATE OF CALIFORNIA
 2       IN AND FOR THE COUNTY OF SAN MATEO
                   ---oOo---
 3
    NICKLOS CIOLINO,          )
 4  CHARLES CIOLINO,          )
    STEPHEN DANIELE,          )
 5  DANIEL DELORENZI,         )
    ROBERTY AGUILAR,          )
 6            Plaintiffs,     )
                             )
 7       vs.                 ) Case No. 422430
                             ) VOLUME 10
 8  JOHN A. RYAN,            ) PAGES 1257 TO 1543
            Defendant.       )
 9  _____ )
    JOHN A. RYAN,            )
10     Cross-Complainant,    )
       vs.                   )
11  VON C. CUMMINGS, et al., )
       Cross-Defendants.     )
12  _____ )
    AND ALL OTHER RELATED    )
13  CROSS ACTIONS            )
    _____ )
14

        TRANSCRIPT OF JURY TRIAL PROCEEDINGS
15
      BEFORE:  HON. THOMAS MCGINN SMITH, JUDGE
16
                  DEPARTMENT 41
17
    DECEMBER 2, 4, 5, 8, 9, 10, 11, 12, 15, 2003
18      DECEMBER 16, 17, 18, 19, 22, 23, 26, 2003
            DECEMBER 29, 30, 31, 2003
19            JANUARY 8, 9, 2004

20  A P P E A R A N C E S:
    FOR PLAINTIFFS:  MICHAEL D. LIBERTY
21                   ATTORNEY AT LAW
                     1290 HOWARD AVENUE, #303
22                   BURLINGAME, CA 94010

23  FOR DEFENDANT:   LOUIS S. FRANECKE
                     ATTORNEY AT LAW
24                   4380 REDWOOD HIGHWAY, #A6
                     SAN RAFAEL, CA 94903
25                   REPORTED BY
      DEBRA L. RAMIREZ, CSR. NO. 7692
26           OFFICIAL COURT REPORTER
                   ---oOo---
```

1    a chance to get a lien on John Ryan's home

2    like you had done for the -- I don't know --

3    the group of people you are representing

4    today.

5        Q.    You understood that I have or I had

6    put liens on Mr. Ryan's house on behalf of

7    my clients?

8        A.    Yes.    What I had done, I found out

9    there were attachments or liens on John's

10   house, and I thought, wow, if -- because at

11   this point, people started having rumors

12   that John had done a Ponzi scheme, or these

13   were -- these allegations John was involved

14   with this Von Cummings, and they swindled

15   everybody.

16           So when I found out that

17   Mr. Liberty had all these liens on John's

18   home, since I had retained Mr. Cory for Bay

19   View, I said:

20              "Hey, George, could you get me the

21                same thing if everybody is lining

22                up on this guy's house"?

23           I do real estate secure liens, get

24   paid in the order recorded.   So I thought,

25   well, get my head out of the sand, get

26   something done, whether I would foreclose on

1    him or not whether I had a opening...  Like

2    I said before, I had a deed that I didn't

3    record, knowing I could have now, I had

4    nothing and if everybody was going to line

5    up on John's house, I had to do the same

6    thing.

7        Q.    And you wanted to record a deed on

8    John's house because you thought he was

9    liable for your investment loss; isn't that

10   true?

11       A.    Well, not John, personally.  I

12   thought if you were able to get a lien for

13   these other people against Von Cummings on

14   his house, that I should do the same.

15       Q.    Why wouldn't you want to admit to me

16   that Mr. Ryan was liable if your impression

17   when you were trying to put a lien on his

18   house?

19       A.    I just wanted a lien.  I didn't care

20   who was liable.  I wanted the lien.

21       Q.    What's a lien mean?  Mr. Stewart, in

22   your experience as a mortgage broker,

23   doesn't it mean that he owes you money?

24       A.    It means this, his home secures a

25   loan he has agreed to.

26       Q.    And the reason why you wanted it on

1    Mr. Ryan's house was because you felt he was
2    liable to you; isn't that true?
3        A.    No.  I felt that John had equity in
4    his home.  I knew he had to refinance and he
5    had a large equity position, and I figured
6    if you were able to get a lien from
7    Paramount Investment on John's home, I would
8    ask George Cory to do it and George said:
9              "Michael Liberty, I know this guy.
10             If he's already done it, he's got a
11             blue print, he would be the
12             quickest way if I was to do it."
13             I didn't know if John was liable.  I
14   just wanted a lien.  I figured if you did
15   for Paramount and these people, you can do
16   it for me.
17       Q.    You never tried to get a lien on Von
18   Cummings' house, did you?
19       A.    No, I -- he had no equity, plus,
20   he's out of state.  It was like beating a
21   dead horse.  The guy promised $400,000 and
22   had nothing to chase good money after.  At
23   this point I didn't want to spend anymore
24   money than I had to.
25       Q.    Let me understand.  You were trying
26   to get a lien on John Ryan's house, but you

1    Mr. Ryan's house was because you felt he was
2    liable to you; isn't that true?
3        A.    No.  I felt that John had equity in
4    his home.  I knew he had to refinance and he
5    had a large equity position, and I figured
6    if you were able to get a lien from
7    Paramount Investment on John's home, I would
8    ask George Cory to do it and George said:
9              "Michael Liberty, I know this guy.
10             If he's already done it, he's got a
11             blue print, he would be the
12             quickest way if I was to do it."
13             I didn't know if John was liable.  I
14   just wanted a lien.  I figured if you did
15   for Paramount and these people, you can do
16   it for me.
17       Q.    You never tried to get a lien on Von
18   Cummings' house, did you?
19       A.    No, I -- he had no equity, plus,
20   he's out of state.  It was like beating a
21   dead horse.  The guy promised $400,000 and
22   had nothing to chase good money after.  At
23   this point I didn't want to spend anymore
24   money than I had to.
25       Q.    Let me understand.  You were trying
26   to get a lien on John Ryan's house, but you

1    didn't hold him responsible, true?

2    A.    I would phrase that, yeah.

3    Q.    You held Von Cummings responsible,

4    right?

5    A.    Correct.

6    Q.    So, isn't a lien -- don't you get

7    paid off on a lien from Mr. Ryan, not from

8    Mr. Cummings?

9    A.    Yes.

10   Q.    So, how does that square in your

11   mind, Mr. Stewart, that Mr. Ryan was going

12   to be the one paying you off, but you don't

13   hold him responsible financially?

14   A.    Well, back to your question which

15   was why did I come to you?  That's why I

16   came to you.  I didn't hold John

17   responsible.  My whole thought was, this

18   man, this attorney, Michael Liberty, went

19   out and got these secured liens.  I don't

20   know how you did it, why you did it, who you

21   did -- how or anything.  You did it.

22         Paramount Financial, these people

23   back in Ohio, that were owing me money, you

24   got a lien on his house for them.  That's

25   why I called you to go do that.

26   Q.    Who did you think on whose behalf I

1    obtained these liens?

2        A.    I don't have them.  Nick Ciolino --

3    somebody else -- Ciolino, DeLorenzi -- I

4    don't know.  There are five of them I

5    brought to you this day, I want to do this.

6        Q.    You understand that a Court signed

7    an order?

8            MR. FRANECKE:  Objection, Your

9    Honor.

10            THE COURT:  The objection is

11    sustained.

12            Actually, ladies and gentlemen, we

13    are going to take our morning recess now.

14    We have to take another matter out.  So it

15    will be for 20 minutes.

16            Thank you.

17            (Whereupon, a break was taken.)

18

19                    --o0o--

20

21

22

23

24

25

26

```
1      COURT OF APPEAL OF THE STATE OF CALIFORNIA

2                 FIRST APPELLATE DISTRICT

3                       DIVISION ONE

4                       ---oOo---

5   NICKLOS CIOLINO,          )
    CHARLES CIOLINO,          )
6   STEPHEN DANIELE,          )
    DANIEL DELORENZI,         )
7   ROBERTY AGUILAR,          )
             Plaintiffs,      )
8      vs.                    ) Case No. 422430
    JOHN A. RYAN,             ) VOLUME 15
9            Defendant.       ) PAGES 1994 TO 2238
                              )
10  JOHN A. RYAN,             )
      Cross-Complainant,      )
11     vs.                    )
    VON C. CUMMINGS, et al.,  )
12    Cross-Defendants.       )
                              )
13  AND ALL OTHER RELATED     )
    CROSS ACTIONS             )
14                            )

15              REPORTER'S TRANSCRIPT ON APPEAL
                APPEAL FROM THE SUPERIOR COURT
16                  OF SAN MATEO COUNTY

17  DECEMBER 2, 4, 5, 8, 9, 10, 11, 12, 15, 2003
       DECEMBER 16, 17, 18, 19, 22, 23, 26, 2003
18           DECEMBER 29, 30, 31, 2003
                JANUARY 8, 9, 2004
19
    A P P E A R A N C E S:
20
    FOR THE PLAINTIFF    WILLIAM LOCKYER
21  AND RESPONDENT:      ATORNEY GENERAL OF THE
                         STATE OF CALIFORNIA
22                       50 FREMONT STREET
                         SUITE 300
23                       SAN FRANCISCO, CA 94102

24  FOR THE DEFENDANT
    AND APPELLANT:       JOHN RYAN
25
    REPORTED BY:     DEBRA RAMIREZ, CSR NO. 7692
26                   OFFICIAL COURT REPORTER
```

```
 1                IN THE SUPERIOR COURT
               OF THE STATE OF CALIFORNIA
 2          IN AND FOR THE COUNTY OF SAN MATEO
                     ---oOo---
 3
      NICKLOS CIOLINO,           )
 4    CHARLES CIOLINO,           )
      STEPHEN DANIELE,           )
 5    DANIEL DELORENZI,          )
      ROBERTY AGUILAR,           )
 6            Plaintiffs,        )
                                 )
 7      vs.                      ) Case No. 422430
                                 ) VOLUME 15
 8    JOHN A. RYAN,              ) PAGES 1994 TO 2238
            Defendant.          )
 9    _____)
      JOHN A. RYAN,              )
10      Cross-Complainant,       )
        vs.                      )
11    VON C. CUMMINGS, et al.,)
        Cross-Defendants.       )
12    _____)
      AND ALL OTHER RELATED      )
13    CROSS ACTIONS              )
      _____)
14
            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
15
         BEFORE:  HON. THOMAS MCGINN SMITH, JUDGE
16
                    DEPARTMENT 41
17
      DECEMBER 2, 4, 5, 8, 9, 10, 11, 12, 15, 2003
18       DECEMBER 16, 17, 18, 19, 22, 23, 26, 2003
              DECEMBER 29, 30, 31, 2003
19               JANUARY 8, 9, 2004

20    A P P E A R A N C E S:
      FOR PLAINTIFFS:  MICHAEL D. LIBERTY
21                     ATTORNEY AT LAW
                       1290 HOWARD AVENUE, #303
22                     BURLINGAME, CA 94010

23    FOR DEFENDANT:   LOUIS S. FRANECKE
                       ATTORNEY AT LAW
24                     4380 REDWOOD HIGHWAY, #A6
                       SAN RAFAEL, CA 94903
25                     REPORTED BY
          DEBRA L. RAMIREZ, CSR. NO. 7692
26            OFFICIAL COURT REPORTER
                     ---oOo---
```

1    agreement.  You has to have the agreement.

2          Again, you are back to John has to

3    know that this was an Ponzi scheme.  It was

4    a wrong act.  It was incorrect.  It was

5    fraudulent.  It was not a -- there was no

6    Famco deal.  He's got to know all these

7    things to then get into conspiracy, but he

8    didn't know that.

9          It goes on.  You're instructed that

10   John Ryan was -- you have to prove that John

11   Ryan was aware that Von Cummings and others

12   planned to defraud the plaintiffs.  Planned.

13   He has to be aware that there was actually a

14   plan by Von Cummings.

15         Why did I go to Florida?  Again,

16   back to Famco.  There was no plan to

17   defraud.  It may have been unrealistic

18   contracts but there was contracts trying to

19   arrange money to finance Famco.  John had no

20   clue whatsoever that there was any intent to

21   defraud.

22         Let me talk about the checks for a

23   second on what did John testify about this

24   Bear, Stearns 15 million thing.  This was

25   one that I was chuckling about.  You may

26   have heard it on the video.  When I took Irv

```
 1          REBUTTAL CLOSING ARGUMENTS

 2

 3             MR. LIBERTY:  Ladies and gentlemen,

 4    I will be brief.  This is my last

 5    opportunity to speak with you directly, and

 6    I'm going to rebut some of the things that

 7    Mr. Franecke offered you in a very concise

 8    15-minute fashion.

 9             Mr. Franecke suggested you have a

10    hard job to do.  It's not a hard job.  It's

11    easy.  It's easy to award my clients money

12    because the facts are overwhelming.  There

13    was a Ponzi scheme.  There was an intent to

14    defraud.

15             Mr. Ryan was a prime mover with

16    Mr. Cummings.  Perhaps still liability

17    against Mr. Ryan without Mr. Cummings still

18    liability against Mr. Ryan.  Malice,

19    oppression and fraud are overwelming in this

20    case.  The malice is a bit more problematic,

21    but I think it's there.

22             The malice is that Mr. Ryan didn't

23    care how he got my clients' money, just as

24    long as he got it.  That's the malicious

25    act.  The oppression is clear.  It's clear

26    when Mr. Ryan is calling Nick a bottom
```

```
 1      load of these in his car, he only gave
 2      selective portions without the risk factor
 3      to Nick Ciolino, but assume my clients did
 4      read this.  What of it?  So what?  What are
 5      they going to say?  Gee, this looks like a
 6      good deal.  It's all bologna.  There is no
 7      good deal.  There is nothing in here that
 8      would have prevented or allowed my clients
 9      to be informed, my clients about the true
10      deal.  This is not a true deal.  This is a
11      Ponzi scheme.  So what if they would have
12      read it?  They would have been better
13      protected.  No.
14              There is an old saying in fraud
15      cases an apple rots from the inside out.  I
16      will never know the facts of what went on
17      between John Ryan and Von Cummings.  Never.
18      That's in his head, and if what he wants to
19      share with you, that apple that has rotted
20      from the inside out.  We're only seeing the
21      surface.  I don't know about all of the
22      other stuff.  It's hidden.  All I can do is
23      ask questions and review documents and hope
24      that somehow the picture comes out.
25              This Ponzi scheme was developed by
26      Mr. Ryan.  He took in my clients'
```

1       investments in the year 2001 to pay off

2       other investors.  It's the classic scheme.

3       Think about what Mr. Ryan said.  I never

4       knew that Dan DeLorenzi's 100,000 was even

5       in my account.  What?  You get $100,000 of

6       investor money, and you never even knew

7       about it.  How credible is that?  It's not.

8               Remember, when I went through the

9       deposition testimony at nauseum.  It was

10      shown primarily to illustrate that John Ryan

11      was not telling you the truth, wasn't

12      telling me the truth, wasn't telling the

13      Securities and Exchange Commission the truth

14      and wasn't telling Mr. Baldwin's attorney

15      the truth.

16              Time after time I read deposition

17      testimony that impeached him, and I think I

18      saw some of you saying:  Were we are going

19      to see the picture?  He's not an honest

20      person.  Mr. Franecke kept telling you that

21      plaintiffs should have done their own

22      investigation.  That gets back to his

23      opening statement which sounded a lot like

24      that where he said the plaintiffs trusted

25      John.  That's their fault.  They should have

26      gone on the internet, Famco, Von Cummings.

1    They should have asked other people about
2    what this investment was all about, but you
3    have to answer the following question:  Were
4    they allowed to trust John Ryan?  Would a
5    reasonable person have trusted John Ryan?
6    And what John Ryan, what he was saying.  I
7    guess what they were saying, it's so
8    outlandish.

9        You shouldn't have trusted my client
10   but a reasonable person is allowed to trust
11   at face value what somebody is telling them
12   about a financial product.  The worst that
13   will happen is you get your money back.

14       Look at Nicklos Ciolino.  28,000.  I
15   can do the same for you.  Are we allowed to
16   rely on that?  Of course we are.  You take
17   the man at face value, and if he lies to
18   you, that's what your job is.  If you think
19   my guys lied to you, any one of them, you
20   vote accordingly.  If you think John Ryan
21   lied to you, you vote accordingly.  Send a
22   message.

23       Send a message to the John Ryans of
24   the world that in this community we don't
25   put up with fraudsters.  In this community,
26   we don't put with a Ponzini scheme.  In this

```
 1              P R O C E E D I N G S

 2               DECEMBER 30, 2003

 3

 4        (Whereupon, jurors deliberate.)

 5

 6                  --o0o--

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
```

```
 1              THE FOREPERSON:  Okay.
 2              (Whereupon, a break was taken.)
 3              THE COURT:  And let me also thank
 4      you.  It may be one day.  At the absolute
 5      outside would be two days, but it will
 6      probably be one day.
 7              THE FOREPERSON:  Could I make a
 8      request?  The instructions we got were
 9      terrible and they --
10              THE COURT:  The only question is
11      going to be what is the amount of punitive
12      damages that you wish to award.  You already
13      heard the law.
14              THE FOREPERSON:  Thank you.
15              THE COURT:  And let me tell you that
16      the lawyers in Court agree with you on the
17      instructions.
18              (Whereupon, jurors leave the
19                 courtroom at 3:15 p.m.)
20              THE COURT:  Let the record reflect
21      that the jurors have retired.  They're
22      obviously very unhappy.  We have a question
23      of documents.
24              MR. LIBERTY:  Yes, Your Honor.  I
25      have subpoenaed Mr. Ryan's financial
26      documents that I presented to him on the
```

```
 1    STATE OF CALIFORNIA  )
                           )     ss.
 2    COUNTY OF SAN MATEO  )

 3

 4

 5

 6            I, DEBRA L. RAMIREZ, hereby certify:

 7            That I am a Certified Shorthand

 8    Reporter of the State of California;

 9            That in pursuance of my duties as

10    such, I attended the proceedings in the

11    foregoing matter and reported all of the

12    proceedings and testimony taken therein;

13            That the foregoing is a full, true

14    and correct transcript of my shorthand notes

15    so taken.

16            .

17

18                     May 7, 2004

19

20

21

22

23

24    _____
               DEBRA L. RAMIREZ, CSR 7692
25

26
```

1        COURT OF APPEAL OF THE STATE OF CALIFORNIA

2              FIRST APPELLATE DISTRICT

3                 DIVISION ONE

4                 ---oOo---

5  NICKLOS CIOLINO,       )
    CHARLES CIOLINO,       )
6  STEPHEN DANIELE,       )
    DANIEL DELORENZI,      )
7  ROBERTY AGUILAR,       )
         Plaintiffs,   )
8    vs.               ) Case No. 422430
    JOHN A. RYAN,         ) VOLUME 19
9         Defendant.    ) PAGES 2294 TO 2466
    _____)
10  JOHN A. RYAN,         )
      Cross-Complainant,  )
11    vs.               )
    VON C. CUMMINGS, et al.,)
12    Cross-Defendants.   )
    _____)
13  AND ALL OTHER RELATED  )
    CROSS ACTIONS        )
14  _____)

15             REPORTER'S TRANSCRIPT ON APPEAL
            APPEAL FROM THE SUPERIOR COURT
16             OF SAN MATEO COUNTY

17  DECEMBER 2, 4, 5, 8, 9, 10, 11, 12, 15, 2003
     DECEMBER 16, 17, 18, 19, 22, 23, 26, 2003
18        DECEMBER 29, 30, 31, 2003
           JANUARY 8, 9, 2004
19

20  A P P E A R A N C E S:

    FOR THE PLAINTIFF   WILLIAM LOCKYER
21  AND RESPONDENT:     ATORNEY GENERAL OF THE
                  STATE OF CALIFORNIA
22                50 FREMONT STREET
                SUITE 300
23                SAN FRANCISCO, CA 94102

24  FOR THE DEFENDANT
    AND APPELLANT:      JOHN RYAN
25

    REPORTED BY:       DEBRA RAMIREZ, CSR NO. 7692
26                OFFICIAL COURT REPORTER

```
 1                    IN THE SUPERIOR COURT
                    OF THE STATE OF CALIFORNIA
 2            IN AND FOR THE COUNTY OF SAN MATEO
                        ---oOo---
 3
      NICKLOS CIOLINO,          )
 4    CHARLES CIOLINO,          )
      STEPHEN DANIELE,          )
 5    DANIEL DELORENZI,         )
      ROBERTY AGUILAR,          )
 6              Plaintiffs,     )
                                )
 7      vs.                     ) Case No. 422430
                                ) VOLUME 19
 8    JOHN A. RYAN,             ) PAGES 2294 TO 2466
              Defendant.        )
 9    _____   )
      JOHN A. RYAN,             )
10      Cross-Complainant,      )
        vs.                     )
11    VON C. CUMMINGS, et al.,)
        Cross-Defendants.       )
12    _____   )
      AND ALL OTHER RELATED     )
13    CROSS ACTIONS             )
      _____   )
14
             TRANSCRIPT OF JURY TRIAL PROCEEDINGS
15
        BEFORE:  HON. THOMAS MCGINN SMITH, JUDGE
16
                      DEPARTMENT 41
17
      DECEMBER 2, 4, 5, 8, 9, 10, 11, 12, 15, 2003
18      DECEMBER 16, 17, 18, 19, 22, 23, 26, 2003
              DECEMBER 29, 30, 31, 2003
19               JANUARY 8, 9, 2004

20    A P P E A R A N C E S:
      FOR PLAINTIFFS:  MICHAEL D. LIBERTY
21                     ATTORNEY AT LAW
                       1290 HOWARD AVENUE, #303
22                     BURLINGAME, CA 94010

23    FOR DEFENDANT:   LOUIS S. FRANECKE
                       ATTORNEY AT LAW
24                     4380 REDWOOD HIGHWAY, #A6
                       SAN RAFAEL, CA 94903
25                     REPORTED BY
          DEBRA L. RAMIREZ, CSR. NO. 7692
26             OFFICIAL COURT REPORTER
                      ---oOo---
```

```
 1              MR. FRANECKE:  Your Honor, may I
 2     have a side bar for a second?
 3              (Whereupon, there was a discussion
 4                  off the record at side bar.)
 5              THE COURT:  You know, last time,
 6     Mr. Foreperson, you expressed a concern of
 7     the jurors which the Court agreed with you
 8     on that was you didn't like the
 9     instructions.  I'm going to preinstruct you
10     this time.  I'm going to tell you what the
11     law is right now, and I'll tell you again
12     afterwards.  It's not involved.  It's not
13     long.
14              You must decide the amount, if any,
15     you should award each plaintiffs,
16     specifically Nicklos Ciolino, Charles
17     Ciolino, Daniel DeLorenzi, Steve Daniele and
18     Robert Aguilar in punitive damages.
19              The purpose of punitive damages is
20     to punish a wrong doer and to discourage him
21     and others from similar conduct in the
22     future.  There is no fixed standard for
23     determining the amount of punitive damages.
24     You are not required to award any punitive
25     damages.
26              In deciding the amount of punitive
```

```
 1    STATE OF CALIFORNIA   )
                            )      ss.
 2    COUNTY OF SAN MATEO   )

 3

 4

 5

 6            I, DEBRA L. RAMIREZ, hereby certify:

 7            That I am a Certified Shorthand

 8    Reporter of the State of California;

 9            That in pursuance of my duties as

10    such, I attended the proceedings in the

11    foregoing matter and reported all of the

12    proceedings and testimony taken therein;

13            That the foregoing is a full, true

14    and correct transcript of my shorthand notes

15    so taken.

16

17

18                    MAY 7, 2004

19

20

21

22

23

24            _____

25                DEBRA L. RAMIREZ, CSR 7692

26
```

# EXHIBIT 2



UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE DENNIS MONTALI, JUDGE

In Re:                            ) Case No. 05-32933-DM
                                  ) Chapter 11
JOHN A. RYAN and DANIELLE T. RYAN, )
                                  )
              Debtors.            )
_____ )
                                  )
CIOLINO, et al.,                  ) Adv. No. 05-3486
                                  )
              Plaintiffs,         ) PLAINTIFFS' MOTION for
                                  ) SUMMARY JUDGMENT and
         v.                       ) STATUS CONFERENCE
                                  )
RYAN, et al.,                     )
                                  )
              Defendants.         )
_____ )
                                  )
CIOLINO, et al.,                  ) Adv. No. 05-3428
                                  )
              Plaintiffs,         ) STATUS CONFERENCES re:
                                  ) MOTION to REMAND CASE to
         v.                       ) STATE COURT; and ADVERSARY
                                  ) PROCEEDING
RYAN, et al.,                     )
                                  )
              Defendants.         )
_____ )
                                  )
RYAN, et al,                      ) Adv. No. 05-3450
                                  )
              Plaintiffs,         ) MOTION for PARTIAL
                                  ) ADJUDICATION re CIOLINO
         v.                       ) LIEN and STATUS CONFERENCE
                                  )
CIOLINO, et al.,                  )
                                  )
              Defendants.         ) Friday, June 16, 2006
_____ ) San Francisco, California


Appearances listed on next page.

1    lunch." But there was another break and — and then one of the

2    jurors was happy to hear that both sides were going to pay for

3    the lunch.

4            Now beginning at line 14, "The essential elements of a

5    claim of fraud by a negligent misrepresentation are as follows."

6    And then "Number 3, Regardless of actual belief, defendant must

7    have made the representation without any reasonable grounds or

8    believing it to be true." I don't think that gets you to actual

9    fraud for 523(a)(2) purposes, so —

10           MR. LIBERTY: I think that was an instruction on

11   negligent misrepresentation.

12           THE COURT: Right. Well, no, —

13           MR. LIBERTY: And —

14           THE COURT: — he says, "fraud by a negligent

15   misrepresentation." Look at line 15.

16           MR. LIBERTY: I see it. I see it. The fact that —

17           THE COURT: Now I realize the judge was probably

18   reading from his cue cards with all these instructions, but

19   there's a lot of redundancy in these instructions. I'm glad I

20   wasn't on that jury.

21           MR. LIBERTY: There are —

22           THE COURT: But —

23           MR. LIBERTY: But if you would take a look, Your

24   Honor, at page 49 of the actual jury instructions, that is the

25   charge for fraud and deceit. It's Bates-stamped 49.

Case: 09-03134   Doc# 36   Filed: 07/09/10   Entered: 07/09/10 16:49:22   Page 55 of
64

State of California        )
                          )   SS.
County of San Joaquin   )

      I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

      I further certify that I am not a party to nor in any way interested in the outcome of this matter.

      I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate No. 00124. Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.

                                Susan Palmer
                                Palmer Reporting Services

                                Dated July 7, 2006

PALMER REPORTING SERVICES
P. O. Box 30727   Stockton, California  95213-0727   (800) 665-6251
Case: 09-03134   Doc# 36   Filed: 07/09/10   Entered: 07/09/10 16:49:22   Page 56 of 64

# EXHIBIT 3



OFFICE OF
THE SECRETARY

OCT 1 4 2004

CERTIFIED MAIL
RETURN RECEIPT REQUESTED
Mr. John A. Ryan
c/o Roger P. Sugarman, Esq.
Kegler Brown Hill & Ritter
Suite 1800
65 East State Street
Columbus, OH  43215-4294

Re:     In the Matter of John A. Ryan

Dear Mr. Ryan:

Please find enclosed the Order Instituting Administrative Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934 and Section 203(f) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions (the "Order") in the above-referenced matter. The Commission has determined to accept your Offer of Settlement, dated April 26, 2004, and accordingly, has issued the enclosed order. The sanctions imposed by the Order shall be effective immediately.

If you have any questions or wish to discuss any aspect of the proceedings, you may communicate with Carl Tibbetts at 450 5th Street, N.W., Washington, DC 20549-0911. His phone number is (202) 942-4817.

Sincerely,

Jonathan G. Katz
Secretary

Enclosure

By: J. Lynn Taylor
Assistant Secretary

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 50544 / October 14, 2004

INVESTMENT ADVISERS ACT OF 1940
Release No. 2314 / October 14, 2004

ADMINISTRATIVE PROCEEDING
File No. 3-11709

In the Matter of

      Von Christopher Cummings
      John A. Ryan
      Kevin L. Grandy
      James Curtis Conley
      Michael L. Vogt
      John E. Hawley, Jr.,

Respondents.

ORDER INSTITUTING
ADMINISTRATIVE PROCEEDINGS
PURSUANT TO SECTION 15(b) OF THE
SECURITIES EXCHANGE ACT OF 1934
AND SECTION 203(f) OF THE
INVESTMENT ADVISERS ACT OF 1940,
MAKING FINDINGS, AND IMPOSING
REMEDIAL SANCTIONS

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted pursuant to Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act") against Respondents James Curtis Conley ("Conley"), Michael L. Vogt ("Vogt") and John E. Hawley, Jr. ("Hawley") and Section 203(f) of the Investment Advisers Act of 1940 ("Advisers Act") against Respondents Von Christopher Cummings ("Cummings"), John A. Ryan ("Ryan"), Kevin L. Grandy ("Grandy") and Conley (collectively Cummings, Ryan, Grandy, Conley, Vogt and Hawley are referred to as "Respondents").

## II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, and the findings contained in Section III.A(2) with respect to Cummings, Section III.B(2) with respect to Ryan, Section III.C(2) with respect to Grandy, Section III.D(2) with respect to Conley, Section III.E(2) with respect to Vogt and Section III.F(2) with respect to Hawley, which are admitted, Respondents consent to the entry of this Order Instituting Administrative Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934 and Section 203(f) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions ("Order"), as set forth below.

## III.

### A.     Cummings

On the basis of this Order and Cumming's Offer, the Commission finds that

     1.     Cummings held himself out as an investment adviser and represented Paramount Financial Partners, L.P. ("Paramount Financial") as a registered investment adviser when he solicited and induced clients and other associates to invest. Cummings claimed to investors that Paramount Financial was a hedge fund that generated large returns for clients. Paramount Financial and Cummings were not registered with the Commission as investment advisers. Cummings is licensed by the National Association of Securities Dealers (NASD). Cummings, age 34, resides in Dublin, Ohio.

     2.     On September 27, 2004, a final judgment was entered by consent against Cummings, permanently enjoining him from future violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act, in the civil action entitled Securities and Exchange Commission v. Von Christopher Cummings, et al., Civil Action Number C2-02-629, in the United States District Court for the Southern District of Ohio ("SEC v. Cummings, et al.").

     3.     The Commission's complaint alleged that Cummings solicited and induced clients to participate in Paramount Financial investments. Cummings claimed to be a registered investment adviser in order to further Paramount Financial's activities. Cummings and Paramount Financial were not registered with the Commission as investment advisers. Cummings did not invest the investors' funds as promised.

### B.     Ryan

On the basis of this Order and Ryan's Offer, the Commission finds that

2

1.	Between January 1, 2001 and July 5, 2001, Ryan was associated with Paramount Financial, a purported hedge fund that was falsely represented to investors as generating large returns for clients. Unbeknownst to Ryan at the time, Paramount Financial was in fact not a hedge fund and did not buy or sell securities for clients' accounts. Ryan, however, at the direction of Cummings, acted as an unregistered investment adviser that used investor funds to repay prior investors and for personal and business expenses.

2.	On September 27, 2004, a final judgment was entered by consent against Ryan, permanently enjoining him from future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act, in the civil action entitled SEC v. Cummings, et al.

3.	The Commission's complaint alleged, among other things, that Ryan solicited and induced clients to participate in Paramount Financial investments; that Ryan and Paramount Financial were not registered with the Commission as investment advisers; and that Paramount Financial did not invest the investors' funds as promised.

**C.**	**Grandy**

On the basis of this Order and Grandy's Offer, the Commission finds that

1.	Grandy was associated with Paramount Financial when he solicited and induced clients and other associates to invest. Grandy claimed to investors that Paramount Financial was a hedge fund that generated large returns for clients. Paramount Financial and Grandy were not registered with the Commission as investment advisers. Grandy, age 34, resides in Columbus, Ohio.

2.	On September 27, 2004, a final judgment was entered by consent against Grandy, permanently enjoining him from future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act, in the civil action entitled SEC v. Cummings, et al.

3.	The Commission's complaint alleged that Grandy solicited and induced clients to participate in Paramount Financial investments. Grandy and Paramount Financial are not registered with the Commission as investment advisers.

**D.**	**Conley**

On the basis of this Order and Conley's Offer, the Commission finds that

1.	Conley was a Paramount Financial employee from July 1999 through at least August 2001. Conley opened and conducted transactions in various bank accounts as part of the Paramount Financial scheme. Conley also falsely claimed to be president of a New York broker-dealer in connection with one of Paramount Financial's fraudulent schemes. Conley is a licensed broker with Series 7 and 24 securities licenses. Conley, age 33, resides in Columbus, Ohio.

3

2.     On September 27, 2004, a final judgment was entered by consent against Conley, permanently enjoining him from future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act, in the civil action entitled SEC v. Cummings, et al.

3.     The Commission's complaint alleged that Conley opened and conducted transactions in various bank accounts used to deposit investor funds and wrote checks to investors which did not clear in furtherance of Paramount Financial's fraudulent schemes. Conley also falsely claimed to be president of a New York broker-dealer in connection with one of Paramount Financial's fraudulent schemes. Conley had Series 7 and 24 licenses.

## E.     Vogt

On the basis of this Order and Vogt's Offer, the Commission finds that

1.     Vogt is a licensed broker and registered representative who solicited and induced clients and other associates to invest in Paramount Financial, a purported hedge fund that was falsely represented to investors as generating large returns for clients. In fact, Paramount Financial was not a hedge fund and did not buy or sell securities for clients' accounts but used investor funds to repay prior investors and for personal and business expenses. Vogt, age 31, is a resident of Clearwater, Florida.

2.     On September 27, 2004, a final judgment was entered by consent against Vogt, permanently enjoining him from future violations of Section 15(a) of the Exchange Act in the civil action entitled SEC v. Cummings, et al.

3.     The Commission's complaint alleged that Vogt solicited and referred clients to participate in Paramount Financial investments. Vogt did not disclose to his registered broker-dealer employer that he had solicited investors for Paramount Financial in exchange for fees and commissions from Paramount Financial in the approximate amount of $104,000. Vogt agreed to use nominee accounts to disguise the use of investor funds to pay his commissions.

## F.     Hawley

On the basis of this Order and Hawley's Offer, the Commission finds that

1.     Hawley is a licensed broker and registered representative who solicited and induced clients to invest in Paramount Financial, a purported hedge fund that was falsely represented to investors as generating large returns for clients. In fact, Paramount Financial was not a hedge fund and did not buy and sell securities for clients' accounts, but used investor funds to repay prior investors and for personal and business expenses. Hawley, age 33, is a resident of Mount Vernon, New York.

4

2.      On September 27, 2004, a final judgment was entered by consent against Hawley, permanently enjoining him from future violations of Section 15(a) of the Exchange Act, in the civil action entitled SEC v. Cummings, et al.

3.      The Commission's complaint alleged that Hawley solicited and referred clients to participate in Paramount Financial investments. Hawley did not disclose to his registered broker-dealer employer that he had solicited investors for Paramount Financial in exchange for fees and commissions from Paramount Financial in the approximate amount of $80,000. Hawley agreed to use nominee accounts to disguise the use of investor funds to pay his commissions.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED:

A.      Pursuant to Section 203(f) of the Advisers Act, that Respondents Cummings, Ryan, Grandy and Conley be, and hereby are barred from association with any investment adviser;

B.      Pursuant to Section 15(b)(6) of the Exchange Act, that Respondent Conley be, and hereby is barred from association with any broker or dealer;

C.      Pursuant to Section 15(b)(6) of the Exchange Act, that Respondents Vogt and Hawley be, and hereby are barred from association with any broker or dealer, with the right to reapply for association after one year to the appropriate self-regulatory organization, or if there is none, to the Commission.

Any reapplication for association by the Respondents will be subject to the applicable laws and regulations governing the reentry process, and reentry may be conditioned upon a number of factors, including, but not limited to, the satisfaction of any or all of the following: (a) any disgorgement ordered against the Respondent, whether or not the Commission has fully or partially waived payment of such disgorgement; (b) any arbitration award related to the conduct that served as the basis for the Commission order; (c) any self-regulatory organization arbitration award to a customer, whether or not related to the conduct that served as the basis for the Commission order; and (d) any restitution order by a self-regulatory organization, whether or not related to the conduct that served as the basis for the Commission order.

By the Commission.

Jonathan G. Katz
Secretary

By: J. Lynn Taylor
Assistant Secretary

5

<u>Service List</u>

Rule 141 of the Commission's Rules of Practice provides that the Secretary, or another duly authorized officer of the Commission, shall serve a copy of the Order Instituting Administrative Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934 and Section 203(f) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions ("Order"), on the Respondent and his legal agent.

The attached Order has been sent to the following parties and other persons entitled to notice:

Honorable Brenda P. Murray
Chief Administrative Law Judge
Securities and Exchange Commission
450 5th Street, N.W.
Washington, DC 20549-1106

Carl Tibbetts, Esq.
Division of Enforcement
Securities and Exchange Commission
450 5th Street, N.W.
Washington, DC 20549-0911

Mr. Von Christopher Cummings
c/o Michael Bornstein, Esq.
580 S. High Street, 3rd Floor
Columbus, OH 43215

Michael Bornstein, Esq.
580 S. High Street, 3rd Floor
Columbus, OH 43215
(Counsel for Von Christopher Cummings)

Mr. John A. Ryan
c/o Roger P. Sugarman, Esq.
Kegler Brown Hill & Ritter
Suite 1800
65 East State Street
Columbus, OH 43215-4294

Roger P. Sugarman, Esq.
Kegler Brown Hill & Ritter
Suite 1800
65 East State Street
Columbus, OH 43215-4294
(Counsel for John A. Ryan)